### BRYANT and others *v.* CHARTER OAK LIFE INS. Co.

*(Circuit Court, N. D. Illinois.* July 9, 1885.)

MORTGAGE—CONVEYANCE WITH RESERVATION OF LIFE-ESTATE—PAYMENT OF IN-
SURANCE MONEY—RENEWAL OF MORTGAGE—FORECLOSURE.

B. borrowed $19,000 from I., and gave his bond for that amount, and secured
it by mortgage on certain real estate in Chicago. The mortgage provided that
B. should keep the property insured against fire and assign the policies as collat-
eral security, which was done. The mortgage provided that in case of loss the
mortgagee and his assigns might collect the policies and apply the money in
payment of the loan. B. subsequently conveyed the property, in consideration
of love and affection, to his children, reserving a life-estate therein to himself.
I. sold and assigned the bond and mortgage to C., and the bond became due
and remained unpaid until the buildings were destroyed by fire. C. collected
$8,875 on the policies and gave B. credit on his bond for that amount. Subse-
quently, at his request, B. was allowed to renew the mortgage for five years,
and to receive and expend the amount collected on the policies, less the inter-
est due on the bond, in restoring the burned buildings. *Held,* that the money
paid to C. did not extinguish the mortgage *pro tanto;* that the agreement be-
tween B., as life tenant, and C. was valid; and that C. was entitled to foreclose
the mortgage on default in payment thereof.

In Chancery.

*Hugh L. Mason,* for complainant.

*Cyrus Bentley,* for defendant.

GRESHAM, J. James M. Bryant borrowed $19,000 from E. S. Isham,
on the seventeenth day of May, 1866, and on the same day gave his
bond for that amount, and, to secure its payment, executed a mortgage
upon real estate in Chicago. It was made the duty of the mortgagor,
by a provision in the mortgage, to keep the premises insured against
fire, and assign the policies to the mortgagee as collateral security.
Policies were obtained and assigned in pursuance of this covenant.
The mortgage also provided that the mortgagee and his assigns might
collect the policies in case of loss, and apply the money in payment
of the mortgage debt. On the twenty-eighth of August following, Bry-
ant, in consideration of love and affection, by a quitclaim deed con-
veyed the mortgaged premises to his children, reserving a life-estate
to himself. This deed contained the following:

"And it is hereby understood and agreed that the said party of the first
part reserves the right and the power to charge each, any, and all of said lots
or parcels of land by mortgages or trust deeds, conveying the fee-simple title
thereof, for moneys raised, or to be raised, loaned, or borrowed thereon, for the
purposes of improving or adding to the house or houses now upon any one
or more or all of said parcels of land or lots, or erecting upon any one or
more or all of said lots, any new building or buildings, whenever, in his
opinion, the same may be necessary or proper, by reason of injury or destruc-
tion of any house or houses now on said lots, or any of them, by fire or other
casualty, or ordinary wear and tear from use, occupation, or time. Said im-
provements, if made, being for the benefit of those entitled, or to be hereafter
entitled, to said lots, and it being right and proper to charge the whole es-
tate in fee-simple with the moneys to be raised for such improvements. And
it is further understood, provided, and agreed that no person or persons who

make a loan or loans upon such mortgages or trust deeds shall be required to look to the application of such moneys.

"It is distinctly understood that said party of the first part reserves to himself a life-interest in the property hereby conveyed."

On the twenty-fourth of January, 1867, Isham sold and assigned the bond and mortgage to the defendant. The bond became due on the seventeenth day of May, 1871, and remained wholly unpaid until the ninth day of October of the same year, when the insured buildings were destroyed by the great Chicago fire. On the twenty-first of November following, the defendant collected $8,875 on the policies, and on its books gave the mortgagor credit for that amount, but made no indorsement of this credit on the bond or mortgage. On the second day of June, 1878, the mortgagor made application to the defendant for a renewal of the mortgage for five years, and asked that he be permitted to receive and expend the insurance money in restoring the destroyed buildings. The defendant agreed to this on the tenth of the same month, and on the faith of this agreement the mortgagor proceeded to rebuild. After the mortgagor had expended between eight and ten thousand dollars under the agreement, the defendant, on the thirtieth of September following, delivered to him the amount collected on the policies, less the interest which had accrued and remained unpaid on the bond. The exact amount the mortgagor thus received under the old mortgage, and without executing a new one, was $7,880.09.

It is insisted by the complainants that the money paid to the defendant amounted to an extinguishment *pro tanto* of the mortgage; and that the mortgagor, as life-tenant, could not mortgage the fee. It is not denied that the insurance money was expended in good faith, in restoring the destroyed buildings. As life-tenant the mortgagor was entitled to possession of the premises, and the rents and profits, and no one could interfere with his possession, so long as he committed no waste. He was bound to keep down the interest, but he was not bound to pay off incumbrances. Although the evidence is not clear on that point, it may be assumed that the mortgagor had the buildings insured before he executed the deed to his children. No right was secured to them in the deed, or otherwise, to share in the benefit of the insurance. The mortgagor's covenant to keep the buildings insured for the benefit of the mortgagee was his personal obligation to the latter. While the policies were held by the mortgagee as collateral security to the mortgage debt, they were also intended to indemnify both the mortgagee and the mortgagor. It does not follow that, because the defendant, as the owner of the bond and mortgage, was authorized to collect the insurance money, and apply it as a payment on the debt, that the underwriters might not have paid the loss to the mortgagor, with the mortgagee's consent. If payment had been thus made, the children could not have complained. In using the insurance money to rebuild, and thus

restore the impaired security, no injury resulted to the estate.   This money was placed to the mortgagor's credit on the defendant's books without being indorsed as a credit on the bond; it stood for the destroyed building, and, as such, was collateral security for the debt, just as the policies were before the destruction of the property.   It was therefore competent for the defendant and the mortgagor to dispose of this money as they saw fit.   The mortgagor did not choose to direct the defendant to apply it as a payment on the mortgage debt. *Gordon* v. *Ware Savings Bank*, 115 Mass. 588.   The right asserted by the children as remainder-men is unfounded both in law and equity.

It follows from this view of the case that, without reference to the terms of the deed from the mortgagor to his children, the defendant, the Charter Oak Company, is entitled to a decree on its cross-bill for the amount of the bond and interest, less the credit already made on the interest, and a decree of foreclosure.